NigtiolsoN, C. J.,
delivered the opinion of the court.
Complainants are the administrator, and half brothers and sisters, of Andrew R. Baird, who died in Mississippi in August, 1865, unmarried, without issue and intestate. Defendants are his whole brothers and sisters, and are in possession of the personal estate of which he died possessed. Complainants insist, that although Andrew R. died in Mississippi, yet that Tennessee was his domicil; and that his personal effects are subject to distribution under the laws of Tennessee, by which the half brothers and sisters are distributees. Defendants insist that his domicil was in Mississippi, by the laws of which the half brothers and sisters take no interest in his personal estate. The only question in the case is, whether Andrew R. Baird had his domicil in Tennessee or in Mississippi at the time of his death ? . *
A careful examination of the proof leaves no doubt in our minds as to the following facts: Andrew R. Baird was born and raised in Tennessee, and had his domicil here until 1859, when he removed to Arkansas, and settled there as a lawyer. He remained in Arkansas until the breaking out of the war in 1861. He then returned to Tennessee for the purpose of entering the Confederate army, but being disappointed in procuring a quartermaster’s position, he abandoned his purpose to join the army, and remained for some time in Tennessee.
We are satisfied, that after his settlement in Arkansas as a lawyer, he had abandoned and lost his *41 domicil in Tennessee, and that when be returned to Tennessee to join the arrny^ his domicil was in Arkansas. But when he gave up his purpose to join the army, he abandoned the idea of returning to Arkansas, ordered his books and movables to be sent to Memphis, and there held out as a lawyer and speculated in cotton. This was an abandonment of his domicil in Arkansas. At an early day, after returning from Arkansas to Tennessee, he was seized with the mania for speculation, and from that time until the close of the war he was actively, constantly and successfully engaged in all kinds of speculations which promised to be profitable. We see in the evidence nothing that indicates that he then regarded Tennessee, or any other specific place, as his domicil. Upon abandoning his domicil in Arkansas and returning to Tennessee, the law would make Tennessee his domicil, until he might' change it by removing to and settling animo manendi in some other State.
We are satisfied, that when he left Memphis and went to St. Louis, under the pressure of threatened draft into the Federal army, he did not go there with any fixed purpose of making Missouri his permanent home. His residence at St. Louis was temporary, and his purpose was to seek some other r locality at the close of the war. During his stay in St. Louis he indulged his passion for speculations .extensively, his field of operations being up and down the Mississippi liver, dealing in cotton, tobacco, and any other southern product that would pay. Although while in Missouri he spoke of Tennessee as his home, and of *42 returning there after the war, we can not regard these expressions in any other light than indicating that his family were in Tennessee, and that he claimed his home there on that account; but not that he meant thereby to indicate any purpose to make Tennessee his future permanent home. This conclusion is confirmed by the fact- that he was negotiating arrangements, while in St. Louis, for engaging in speculations outside of Tennessee, and by the fact, that while living in St. Louis he told his mother and sisters that he never intended to make Tennessee his home. But during his stay in St. Louis his domicil was in Tennessee, by operation of law, and not by any definite and fixed purpose of his to make it his permanent home. This conclusion is demonstrated by the fact that when the war closed and he finally consummated his future arrangements and plans, he did not select Tennessee, but Mississippi, for the field of his operations and .speculations.
The proof is satisfactory, that, when Andrew B,. Baird effected his arrangement with Frank Holtzclaw, at St. Louis, to carry his money and a stock of goods to Mississippi, and to engage in business as merchants and cotton dealers, he had formed no fixed purpose to make Mississippi his future permanent home. He had $10,000 in' gold, and Holtzclaw had a stock of goods. His object was to unite the mercantile business with his cotton speculations, and from their joint operations to realize early and large profits. He was striking out for a quick fortune without any definite idea as to how long he would remain in Mississippi, *43 or as to where he would go for his next venture. We are satisfied that Holtzelaw states the case truly in his deposition when in answer to the question, “was it the intention of yourself and partner to remain there (Mississippi) permanently?” he says: “It was our intention to remain there so long as we could make it pay profitable.”
The proof shows that, while Andrew it. Baird was in Memphis on his way to Mississippi to carry out his arrangement with Holtzelaw, he spoke of returning to Tennessee after he should have accomplished his object in Mississippi. We attach but little weight to the conversation detailed by the witness, Mitchell. He says Baird proposed to him to go with him and take charge of the stock of goods, and sell them, while Baird would operate on his $10,000 in gold in cotton speculations, that they would divide the profits, return to Memphis and vest their money in real estate, and practice law in partnership. It is certain that, at the very time this witness represents Baird as making this proposition, Baird and Holtzelaw had formed a partnership, and Holtzelaw had bought the goods, and probably was then on his way to Mississippi to meet Baird. It is incredible that, under the circumstances, he would have made such a proposition with any idea that Mitchell would accept it. We infer that, if any such conversation occurred, Baird was merely amusing Mitchell by building airy castles for the future. It is manifest that at that time Baird was confirmed in his passion for speculation. He was warned of the danger of the enterprise, but he was completely under the do *44 minion of his passion for speculation, and determined to indulge it at the risk of his life. This proves how confident he was of success, and under that anticipation he may have indulged his imagination as to the investment of his large profits in Tennessee. J. McHenry proves that he conversed with Baird while at Memphis on his way to Mississippi. He and Baird agreed to form a partnership to practice law in Memphis when Baird should finish his speculations in Mississippi. 'Witness warned Baird of the danger of his enterprise.
Another witness, E. P. Bates, who details Baird’s declarations, while in Memphis on his way to Mississippi, as to his purpose to return to Tennessee, when asked if he thought from Baird’s declarations that he would have returned from Mississippi if he had been successful in money, he answered: “I believe if he had lived and been making money enough to have satisfied him,. he would have remained there always, although he always claimed that this (Memphis) was to be his future permanent home.” This witness comprehended the character of Baird, and understood that to make money was his predominant passion, and that his future permanent residence at Memphis was a secondary and contingent idea with him. He corroborates the proof of Holtzclaw as to the intention of Baird to remain in IVfississippi as long as he could make it profitable.
Our conclusion is, that Baird went to Mississippi in quest of a fortune, and that he had no definite and fixed purpose either to make that State his per *45 manent borne or to return and make Tennessee bis permanent borne. His first paramount object was to make money, and after .be should gratify that desire to bis full satisfaction, bis natural partiality for the State of bis birth would point to that State as his future permanent home for the enjoyment of his fortune, and it was in that view that he spoke of malting Tennessee his future home.
He was evidently elated with the success of his speculations during the war, and was fond of communicating his good fortune to his old friends. In these conversations he was profuse in agreeing to arrangements for future partnerships by which his friends might reap some of the fruits of his good fortune already realized, and that also anticipated from further speculations. "We think these conversations furnish very little reliable evidence of any fixed purpose as to his future. residence after he had exhausted his passion for speculations.
We have already stated that, by law, Tennessee was the domicil of Baird when he removed from Arkansas, and this would continue to be his domicil until he should secure another.
Whether he made Mississippi his domicil by his removal to that State, and settling there in business, remains now to be considered.
There is but little difficulty in laying down the rules of law which govern in questions of domicil. The difficulty is in applying these rules to the facts of the various eases as they arise. In Pearce v. The State, this Court said: “Home, residence, and business *46 are material elements in the legal idea of domicil.” In Layne v. Pardee, 2 Swan, 235, the Court said: “A man is presumed to hold his domicil until another is obtained; and to constitute this change, the fact and the intention must concur.” In Foster v. Hall, 4 Hum., 348, the Court said: “To constitute domicil two things must concur; first, residence; and secondly, the intention of making it the home of the party.” In Stratton v. Brigham, 2 Sneed, 423, the Court quote and adopt the following from Story’s Confl., s. 46: “ If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicil, it is to be deemed his place of domicil, notwithstanding he may entertain a floating intention to return at some future period.” In Bos. & Pull., 230, it is laid down, that “ a man is prima facie domiciled at the place where he is resident at the time of his death.” In Horne v. Horne, 9 Ind. L., 108, Judge Nash held, that “residence did not constitute a domicil, though it was prima facie evidence of it.” And also : “ Residence, for however long a time it may be continued, can not constitute a domicil, without the intention of permanently making it a home; nor can the shortness of time in which the new home is enjoyed, defeat the acquisition when accompanied with the intention, for in the latter there would be the factum and the animus.”
The proof is uncontradicted that Andrew R. Baird removed to Mississippi, engaged in business for from five to seven weeks, when he was robbed and murdered, near the place of his residence. Prima facie he was *47 domiciled in Mississippi, and the question is, whether the facts and circumstances in the proof rebut and overturn this presumption? During the time Baird lived in Mississippi, he was engaged in buying cotton and shipping it to New Orleans, and his partner, Holtzclaw, attended to the store. Holtzclaw proves that it was their intention to remain there as long as their business was profitable; and that if the business became unprofitable, they had an arrangement to go into business at Galveston, Texas; but that their time for staying in Mississippi was indefinite. Witness started to St. Louis to purchase another stock of goods, about the time Baird was murdered. Baird assisted him in counting out between $4,000 and $5,000 from the store, with which to pay for the stock of goods.
E. H. Sanders proved that he lived in Attala county, Mississippi; that Baird was engaged in selling goods and buying cotton at Bluff Springs, in that county, until he was killed. Witness had frequent interviews with him. He spoke of establishing a law office at Kosciusko, in that county.' He seemed desirous to remain there, but felt some anxiety in regard to the people and in giving satisfaction to them, owing to the troubled state of society. He was desirous to become a citizen of our State, and so often expressed himself. He said he liked the country and intended to remain until he was driven away. Never heard him say that he regarded himself as a permanent citizen, but knows that he was anxious to remain and become one. Heard him say he had once been a citizen of Tennessee, but previous to coming to Missis *48 sippi he was from St. Louis, Missouri, and did not regard himself a citizen of Tennessee.
James Seals proved that he knew Baird well at Bluff Springs. Baird proposed to employ him for twelve months, to haul cotton to, and goods from Yazoo City. Witness hauled for him. Baird told witness that he intended to buy out Bluff Springs, and to live and die there. He told witness that he intended to remain permanently in the State, and mentioned it often, and regarded himself a citizen of the State.
G. P. M. Turner proved that his acquaintance with A. R. Baird commenced soon after he came to Attala county. Once or twice he met and conversed with him previous to his death, and from the tenor of his conversation, witness was certainly impressed with the belief that he regarded himself as a citizen of Attala county. He, at one time in the course of their conversation, spoke of the condition and prospects of this county, in a pecuniary and commercial point of view, and witness was thoroughly impressed with the belief, that when he had become generally acquainted with the people of Attala county, through his intercourse with them at Bluff Springs, it was his determination to extend his business to Goodman Station, in Holmes county, on the Mississippi Central Railroad. He made no impression on witness’ mind that he was only temporarily there, but, to the contrary, witness regarded him as a citizen intending to remain there, though witness may have entertained an erroneous opinion on this subject, having never heard, that he remembers, a distinct expression from Baird on this sub *49 ject. He impressed witness at all times in his conversations, that he had come to Mississippi to make this his home. This impression was made by the general tone of his conversation, when speaking of himself, his business, and his prospects.
Mary Baird, mother of A. B. Baird, and of complainants, proved that several months before his death he -told her he never expected to make Tennessee his home. And L. E. Senter, a sister of A. B. Baird, proved that during the war she heard him say he never expected to live in Tennessee any more. He had not been living here since he went to Arkansas, after graduating in college. Henry Elliot proved that he met with A. B. Baird at Vicksburg, Mississippi, a short time before he was killed. ' They were acquaintances of three years standing. Witness lived in Cairo, Illinois. They negotiated about forming a partnership to carry on a commission business in. New Orleans, and agreed to go home and arrange their respective affairs, to go into it the' next fall. Witness understood Baird to speak of his home as being in Attala county, Mississippi, as witness knew of no other business point he had at that time.
The inference from this proof is irresistable that, while Baird was engaged in business in Mississippi, he had no present purpose then in his mind that he would return to Tennessee at any future period. He was there for an indefinite time, and whenever he spoke of making arrangements for future operations, he always looked to other States, and not to Tennessee, for his future location. That he had abandoned any idea of *50 returning to Tennessee to make it bis permanent borne, is the only rational inference to be drawn from the proof. Unless we rashly discredit three or four witnesses who are unassailed, and unless we discredit A. B,. Baird himself, the only home he had while he was in business at Bluff Springs, was Mississippi. The presumption of law arising from his residence and death there, so far from being rebutted or overturned by the facts and circumstances, is strongly sustained and corroborated.
The decree of the Chancellor is reversed, and the bill dismissed with costs.